

FILED
IN OPEN COURT

FEB 1 1 2026

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **UNDER SEAL** |
| | ) | |
| v. | ) | CRIMINAL NO. 2:26-cr-18 |
| | ) | |
| JAYLEN LANE | ) | Wire Fraud |
| | ) | 18 U.S.C. § 1343 & 2 |
| | ) | (Count 1 and 2) |
| Defendant. | ) | |
| | ) | Aggravated Identity Theft |
| | ) | 18 U.S.C. §§ 1028A and 2 |
| | ) | (Count 3) |
| | ) | |
| | ) | Forfeiture |

INDICTMENT

January 2026 Term — At Norfolk, Virginia

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment, unless otherwise stated:

General Allegations

1.      Unemployment Insurance ("UI") is a joint state-federal program that is intended to provide temporary financial assistance to unemployed workers who are unemployed through no fault of their own.  To be eligible for UI benefits, workers must have been separated from their employer or had their hours reduced by their employer.

2.      The federal UI trust fund finances the costs of administering unemployment insurance programs, loans made to state unemployment UI funds, and half of extended benefits during periods of high unemployment.  States can borrow from the federal fund if their own reserves are insufficient.  Each state, including the Commonwealth of Virginia, administers a separate UI program, but all states follow the same guidelines established by federal law.  The

1

Virginia Employment Commission ("VEC") is responsible for administering the unemployment compensation program in the Commonwealth of Virginia. Prior to the expanded COVID-19 benefits described below, eligible recipients received a minimum of $158 per week in traditional UI benefits.

3. In March 2020, the coronavirus ("COVID-19") pandemic resulted in the shutdown of numerous businesses and caused millions of American workers to be out of work. On March 13, 2020, the President declared a national emergency under Section 501 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121 *et seq.* ("Stafford Act"). On March 18, 2020, the President signed into law the Families First Coronavirus Response Act ("FFCRA"), which provided additional flexibility for state unemployment insurance agencies and additional administrative funding to respond to the COVID-19 pandemic. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was signed into law on March 27, 2020. The CARES Act expanded states' ability to provide unemployment insurance for many workers impacted by the COVID-19 pandemic. The CARES Act dedicated over $250 billion to give workers more access to unemployment benefits during the public-health emergency. The passage of the Continued Assistance Act on December 27, 2020, and then the American Rescue Plan Act on March 11, 2021, extended certain unemployment benefits to September 6, 2021.

4. As of April 18, 2020, the President had declared that a major disaster existed in all states and territories under Section 401 of the Stafford Act. On August 8, 2020, to further offset the pandemic impact on American workers, the President authorized the Federal Emergency Management Agency ("FEMA") to expend up to $44 billion from the Disaster Relief Funds for lost wage payments. The President authorized the FEMA Administrator to provide

2

grants to participating states, territories, and the District of Columbia to administer delivery of lost wages assistance ("LWA") to those receiving unemployment insurance.

5. Two of the principal ways in which the government expanded unemployment benefits during the pandemic were (a) making those benefits available for those who had not traditionally qualified, such as contractors, self-employed, and gig workers; and (b) substantially increasing the amount of money paid to those who qualified for unemployment benefits.

6. VEC divided the unemployment compensation program into the following four UI benefit components based upon the CARES Act, the Continued Assistance Act, the American Rescue Plan Act, and the FEMA LWA authorization:

a. Federal Pandemic Unemployment Compensation Program ("FPUC"): The CARES Act increased benefits for workers collecting UI by $600 per week for claims effective on or about March 29, 2020, through on or about July 31, 2020, thereby increasing the weekly benefit to $758 per week. The Continued Assistance Act reinstated FPUC at a reduced amount of $300 per week beginning on or about December 25, 2020. The Continued Assistance Act and the American Rescue Plan Act extended the benefits to on or about September 6, 2021.

b. Pandemic Unemployment Assistance ("PUA"): The CARES Act expanded unemployment benefits for up to 39 weeks of benefits for individuals who did not qualify for traditional UI benefits, including the self-employed, independent contractors, and gig workers or those who were unemployed, partially employed, unable to work, or unavailable to work due to specific COVID-19 related reason(s). The PUA benefit expansion

applied to weeks of unemployment beginning on or about January 27, 2020 through on or about December 31, 2020.  The Continued Assistance Act and the American Rescue Plan Act extended FPUC from on or about December 26, 2020 to on or about September 6, 2021.

c.      Pandemic Emergency Unemployment Compensation ("PEUC"): The CARES Act provided up to 13 weeks of unemployment insurance benefits to those who exhausted their eligibility; it applied to weeks of unemployment from on or about March 29, 2020 through on or about December 31, 2020.  The Continued Assistance Act and the American Rescue Plan Act extended FPUC from on or about December 26, 2020 to on or about September 6, 2021.

d.      Lost Wages Assistance ("LWA"): The FEMA LWA authorization provided an additional $300 per week to claimants in Virginia who were eligible for at least $100 per week in unemployment insurance compensation.  For applicants in Virginia, LWA was automatically paid out in one lump sum of $1,800 on or about October 15, 2020 for six weeks of unemployment between on or about August 1, 2020 (soon after the initial $600-per-week PUA benefits expired), and on or about September 5, 2020, so long as the claimant had certified unemployment eligibility during that time period.  LWA funds were federal monies, but their distribution was administered by VEC.

7.      To qualify for PUA, applicants first had to apply for traditional unemployment benefits, be denied, and then file a new application for PUA benefits.  Unemployed workers did

4

not file separate claims for PUA, FPUC, and LWA benefits. Rather, an existing approved PUA claim resulted in automatic approval for and payment of FPUC ($600/week) and LWA ($300/week) benefits.

8.      During the pandemic, VEC approved PUA benefits for workers who normally would not qualify for UI benefits, to include the self-employed, freelancers, and independent contractors. Such workers typically lack a verifiable wage history. Based on this PUA-wrought change, VEC had to rely on and trust the information provided by the claimant, as VEC could not quickly verify it. To ensure that workers who were unemployed due to the pandemic timely received their benefits, VEC processed and paid out these claims shortly after the claims were submitted. The certification of those self-employed did not initially require any documentary evidence to be provided in support of that certification.

9.      Unemployed workers in Virginia could file for UI benefits either by phone or through the VEC internet portal. The VEC internet portal captures the IP address when an account is logged into, whether to file an initial claim or to conduct weekly recertifications.

10.     The VEC application for a UI claim required entry of personally identifiable information ("PII"), including name, date of birth, Social Security number, physical address, and phone number. It also required answering a series of questions to verify eligibility, such as work history, name of the employer, reason for separation, that the applicant is ready, willing, and able to work, and, to qualify for PUA, that the applicant lost their job due to COVID-19. In addition, as an extra verification step, the applicant could choose to answer a security question.

11.     Once VEC approved a UI claim, claimants had to re-certify their unemployment status on a weekly basis. The claimant had to certify that they are ready, willing, and able to work each day during the weeks they claimed UI, and also certify that their continuing

unemployment was a result of the pandemic. Both initial applications and weekly recertifications were attested to as truthful under penalty of perjury.

12.    Successful applicants could choose whether to have VEC deposit their unemployment benefits directly in a linked bank account or loaded onto a prepaid debit card (typically called a "Way2Go" card), which was mailed to the applicant via the United States Postal Service ("USPS") or other private or commercial interstate carrier to the physical address listed on the application. For applicants who chose a debit card, a Personal Identification Number ("PIN") for the card was sent to the address listed on the application in a separate mailing. Once issued, the prepaid debit cards were automatically reloaded with newly disbursed funds via electronic transfers using the internet.

13.    In order for UI funds to be loaded onto a prepaid debit card "Way2Go" card, VEC sent the "demographic file" on a daily basis via a secure SFTP file transfer connection through their servers located in Sandston, VA to create new unemployment insurance claimant account and to designate funding for both new and existing claimant accounts to Conduent servers located in Sandy, UT. Additionally, VEC sent money via ACH to fund the Way2Go debit card accounts from its SunTrust bank account in Virginia to Comerica Bank located in Detroit, MI via Richmond Federal Reserve.

COUNTS ONE AND TWO

1.    From in or around July 2020 through in or around April 2021, in the Eastern District of Virginia and elsewhere, defendant JAYLEN LANE, and others both known and unknown to the Grand Jury, did knowingly devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, which affected a financial institution, and did transmit and cause to

6

be transmitted by means of wire, radio, and television communication, in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds for the execution of such scheme and artifice, which scheme and artifice, and the execution thereof, operated in substance as follows:

THE SCHEME AND ARTIFICE TO DEFRAUD

2.    LANE used stolen identities of other individuals and filed false and fraudulent UI claims in their names to fraudulently obtain benefits to which he was not entitled.

3.    LANE routinely submitted false certifications indicating his continued eligibility for the fraudulently obtained UI benefits.

4.    LANE had VEC mail him debit cards from a financial institution for the purpose of receiving the fraudulently obtained UI benefits.

5.    LANE fraudulently obtained at least $200,000 of UI benefits using the identities of others without their knowledge and consent.

ELECTRONIC TRANSMISSIONS IN FURTHERANCE OF THE SCHEME AND ARTIFICE

6.    On or about the dates noted, in Virginia Beach, Virginia, in the Eastern District of Virginia and elsewhere, for the purpose of executing the aforesaid scheme and artifice, the defendant JAYLEN LANE, did knowingly transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds, that is the check deposits and resulting electronic transfer of funds, as noted below:

| COUNT | APPROXIMATE DATES OF WIRE | TYPE AND SUMMARY OF WIRES |
|---|---|---|
| 1 | February 17, 2021 | LANE submitted and caused to be submitted false and fraudulent VEC weekly recertifications for UI benefits for S.G., causing VEC to send approximately $916.00 in fraudulently obtained UI funds to a Way2Go debit card. |
| 2 | March 1, 2021 | LANE submitted and caused to be submitted false and fraudulent VEC weekly recertifications for UI benefits for S.G., causing VEC to send approximately $1,374 in fraudulently obtained UI funds to a Way2Go debit card. |

## COUNT THREE
(Aggravated Identity Theft)

1.    The preceding paragraphs of this indictment are realleged and incorporated as if fully set forth herein.

2.    On or about the date and in the manner set forth below, in Virginia Beach, Virginia in the Eastern District of Virginia and elsewhere, defendant, JAYLEN LANE, did knowingly transfer, possess and use, without lawful authority, a means of identification of another person, during and in relation to a felony relating to any provision contained in Chapter 63, that is defendant JAYLEN LANE used and caused to be used said means of identification during and relation to violations of 18 U.S.C. § 1343, wire fraud, knowing that the means of identification belonged to another actual person:

| On or About Date | Means of Identification | During and In Relation to Felony Violation |
|---|---|---|
| October 2020 through March 2021 | S.G.'s social security number, name, and date of birth | Wire Fraud, in violation of 18 U.S.C. § 1343 |

(In violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.)

9

## CRIMINAL FORFEITURE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT:

1.     The defendant, if convicted of either of the violations alleged counts 1 and 2of this Indictment, shall forfeit to the United Stales, as part of sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, which constitutes or is derived from proceeds traceable to the violation.

2.     If any properly that is subject to forfeiture above is not available, it is the intention of the United States to seek an order forfeiting substitute assets pursuant to Title 21, United States Code, Section 853(p) and Federal Rule of Criminal Procedure 32.2(e.).

(In accordance with Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).)

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.

United States v. Jaylen Lane
Criminal No. 2:26cr 18

A TRUE BILL:

REDACTED COPY

_____
FOREPERSON

Todd W. Blanche
Deputy Attorney General

By: _____
Clayton LaForge
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number: 757-441-3031
Facsimile Number: 757-441-6689
E-Mail Address: Clayton.LaForge@usdoj.gov